Filed 4/13/26  In re N.D. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.D., a Person Coming Under the Juvenile Court Law. | H053027 (Monterey County Super. Ct. No. 24JV000522) |
| THE PEOPLE,  Plaintiff and Respondent,  v.  N.D.,  Defendant and Appellant. | |

In this appeal we consider whether police officers had probable cause to search a vehicle during a traffic stop based on the behavior of a trained drug-sniffing dog.

Minor N.D. moved the juvenile court to suppress drugs seized from his vehicle during the traffic stop.  The court denied the motion.  N.D. later admitted an allegation that he possessed a controlled substance (Health & Saf. Code, § 11350, subd. (a)).  The court sustained a juvenile wardship petition and declared N.D. a ward of the court.  (Welf. & Inst. Code, § 602,

subd. (a).[1]) At a dispositional hearing, the court placed N.D. on probation in the custody of his mother.

On appeal, N.D. claims the juvenile court erred by denying his motion to suppress the drugs because the prosecution failed to establish that the dog's sniff of the vehicle's interior did not amount to a search or that the police had probable cause for the search.

For the reasons explained below, we uphold the juvenile court's ruling on the search and seizure, modify the court's dispositional order by striking the maximum time of confinement, and affirm the judgment as modified.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

In July 2024,[2] the Monterey County District Attorney filed a juvenile wardship petition (§ 602, subd. (a)) against N.D. alleging two misdemeanor counts of possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a); count 1 [cocaine] & count 2 ["unprescribed prescription medication"]).

N.D. filed a motion under section 700.1 to suppress all evidence obtained by the police through a warrantless search and seizure (suppression motion or motion).

The district attorney filed an opposition to N.D.'s suppression motion. The district attorney argued, inter alia, that "the use of [a detection canine] was not a search under the Fourth Amendment as it did not expose any noncontraband items." The district attorney further asserted the canine "is a trained, certified narcotics detection dog and thus his alert is reliable. The

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

[2] Unless otherwise indicated, all dates were in 2024.

canine alerted to the presence of narcotics in the car, particularly coming from center console.  This alert alone is sufficient to establish probable cause to search [N.D.]'s car."

In December, the juvenile court held a hearing on N.D.'s suppression motion.  (§ 700.1.)  The district attorney presented the testimony of two police officers about the traffic stop and dog sniff.  Based on the evidence presented, the court denied the motion.

In January 2025, pursuant to a negotiated agreement, N.D. admitted count 1 (possession of cocaine), and the juvenile court dismissed count 2 (possession of an unprescribed prescription medication).

On February 10, 2025, the juvenile court declared N.D. a ward of the court "for a period of 24 months."  The court placed N.D. on probation with terms and conditions and ordered N.D. to reside in the custody of his mother.  The court also ordered that N.D.'s "probation and wardship would terminate on February 10, 2026" (i.e., one year from the date of the dispositional hearing).

B. *Factual Background Regarding the Vehicle Search and Denial of the Suppression Motion*

1. Hearing Evidence on the Traffic Stop and Search

Around 5:30 p.m. on May 17, Salinas Police Department Officer Isodoro Medrano saw a black SUV make "an abrupt turn without using a turn signal" and violate the speed limit.  N.D. was driving the SUV and had a passenger in the vehicle.  Medrano effected a traffic stop on the SUV in "a high crime area" of Salinas that had "a lot of gang activity."  When Medrano approached the SUV (which N.D. had parked in a driveway of a residence), N.D. "appeared very nervous" but not "under the influence."  N.D. did not have a driver's license or any identification on him.  N.D. provided his name and

date of birth to Medrano.[3]  Medrano asked N.D. to exit the SUV and sit on the bumper of a patrol car.  Another officer at the scene similarly asked the passenger to step out of the SUV.

Officer Medrano pat searched N.D. for weapons but did not find anything on him.  Medrano asked for permission to search the SUV.  N.D. declined the request.  Medrano summoned a canine unit believing "there may have been narcotics or firearms inside the vehicle."  Medrano learned that the SUV was registered to N.D.'s mother.

While Officer Medrano was completing a record check and traffic citation for N.D., the canine unit arrived.  The canine officer eventually told Medrano that the dog "alerted inside the vehicle."  Medrano searched the SUV and found suspected cocaine and "Farmapram medication."

Officer Cameron Mitchell (a detection canine handler) testified that he began working with his canine ("Checo") in November 2022.  Officer Mitchell and Checo participated in two, four-week training sessions on narcotics and firearms detection.  Mitchell explained that Checo "is trained in smelling the narcotics odors of heroin, methamphetamine, cocaine, and [] firearms and ammunition."  Checo had assisted Mitchell with searches "at least 200 times."

Before Officer Mitchell took Checo out of his patrol vehicle to perform the dog-sniff examination, Mitchell closed the SUV's open front doors.  Mitchell testified that, with Checo on a leash, he began the examination near the SUV's left rear bumper.  Mitchell described the examination (which was recorded by Mitchell's body-worn camera) as follows:  "As we go towards the front of the front left bumper of the vehicle, [Checo] begins to pull away from

---

[3] The record indicates that N.D. was 17 years old at the time of the stop.

4

the garage [of the residence]. I direct [Checo] back towards the vehicle, at which point he comes back down the driver's side and immediately jumps into the driver's window. Once [Checo] gets inside the vehicle, he begins to spin a few times, then jumps toward the back all the way over the backseats towards like I guess you would call it the trunk of the vehicle and then works his way back to the front."

Officer Mitchell explained that "[Checo] began to spin in the area of the center console. Based on [Mitchell's] training and experience of canines, as they begin to spin repeatedly in the same spot, there's generally an odor and they're trying to target where that odor scent is emitting from." Mitchell noticed that Checo "showed excitement" and "started to whine." "At that point, [Mitchell] then opened the driver's door, had pulled [Checo] out, and put him into the left rear passenger door. [Mitchell] then observed [Checo] go directly underneath the driver's seat towards that center console area. [Checo] stuffed his nose under there and was in that area for some time. [Checo] got out of the vehicle, looked up at [Mitchell], and then sat down." Mitchell added, "At that point in time, once I observed Checo showing some changes in behavior, I believe there was a possible target odor presence in the vehicle. I then informed the officers the vehicle was good for a hand search by the remaining officers on the scene as I was placing Checo back in the [patrol] car." Less than five minutes elapsed between Mitchell's arrival at the scene (around 5:48 p.m.) and Checo's alert.

On cross-examination, Officer Mitchell testified that at one point while Checo was inside the SUV, Mitchell had said "[c]ouche" (which he described as "French for down") and put his "arms up just in case" Checo jumped out of the SUV. Mitchell did this to protect Checo against any injury from a fall and prevent Checo from "jumping out directly onto" Mitchell. Mitchell agreed

with defense counsel that, in the body-worn camera video, Checo appeared to try to exit the SUV. But Mitchell explained, "At that point, I'd seen everything I needed to see. I was going to search, regardless. It's now me trying to locate exactly where that target odor source is emitting from." Mitchell also agreed with counsel that Checo appeared to be "kind of running around the whole vehicle." Mitchell explained that the SUV's open windows and the dog's movements and breathing "waft odors around for [Checo] to eventually try to pinpoint and locate."

On cross-examination by defense counsel about whether there were "multiple" alerts by Checo, Officer Mitchell stated, "So, [Checo] just purely showing me a change in behavior to jump right into a vehicle is already enough for me to give me a big cause to believe that there's a target odor present in the vehicle. For [Checo] to actually jump approximately up four or five feet up into the vehicle of a two by two foot space opening already says enough. That's a huge change in behavior for him to go on his own accord. [¶] Secondly, as I explained earlier, it's not a static environment. You have windows down. Air is going to blow through. You have a dog that's breathing. You have him wagging his tail. Odors can change and move as he's moving through a vehicle, but he's eventually alerting to an area where it could be or had been. [¶] In past cases, we've seen someone have a gun in a backpack, take it out of the backpack and place it somewhere else. He's going to handle the backpack because that's where the odor was sitting the longest and it spent the most time, but it was underneath the seat. [¶] So, the dog is a tool and is going to be not in a static environment. It's going to possibly cause odors in different areas if it has been touched or moved." Mitchell additionally explained that Checo "is excited to do" "his job" and this was not the first time that Checo had jumped into a window.

On redirect examination, Officer Mitchell reiterated that after he had directed Checo toward the left front bumper of the SUV (i.e., before Checo entered the vehicle), Mitchell saw Checo "go to the door and immediately just go into the vehicle." When the prosecutor asked, "What does that indicate again?" Mitchell answered, "Just a change in behavior. [Checo]'s making a furtive [*sic*] movement to follow an odor that isn't, you know, emanating from outside the vehicle. It's emanating from inside the vehicle." The prosecutor next asked if Checo's behavior was consistent with his detection training, Mitchell responded, "He's going to go as close as possible to be next to that target odor source."

The juvenile court admitted into evidence the video footage recorded by Officer Medrano's and Officer Mitchell's body-worn cameras (exhibit Nos. 1 & 2, respectively).[4]

2. Juvenile Court's Ruling

After the prosecution rested, N.D.'s defense counsel argued, inter alia, that the traffic stop was a "prolonged detention" and "this sniff test did not qualify to do a wholesale search."[5] Counsel maintained that the circumstances in the instant case were distinguishable from those in *People v. Stillwell* (2011) 197 Cal.App.4th 996 (*Stillwell*), because the canine in *Stillwell* "seem[ed] much clearer in terms of his behavior and signs" of an alert. Counsel asserted that Checo, by contrast, was "happy and excited and running around the vehicle. There was nothing particularly distinct about

---

[4] The two videos have been transmitted to this court for our review. Exhibit No. 2 is from Officer Mitchell's body-worn camera and shows Checo approaching the SUV and then entering it.

[5] N.D. makes no argument on appeal that the traffic stop was unduly prolonged.

any one place. And it was pretty clear that officer wasn't going to let that dog out of the car until he found something."

The juvenile court denied N.D.'s suppression motion, explaining: "I've listened to the evidence like we all did. Officer Medrano observes this vehicle while on regular patrol. . . . It makes an abrupt left turn onto Alamo Way. The driver wasn't using the turn signal. And then at some point the vehicle sped up in violation of the speed law. . . . [¶] The vehicle then finds itself on Pino Way, [and stops at an address on] Pino way, which was obviously not [N.D.]'s residence. I think the significance of the officer pulling -- asking the driver and the passenger to get out of the car for the pat down search, I think the significance of that was the fact that the area was -- 5:40, . . . in the afternoon. It was a high crime area, according to the officers, a gang area. There was testimony as to the Las Casitas gang in that area. The officer then approached the driver, and it's [N.D.]. [¶] The officer indicates when he was there he believed that [N.D.] was nervous, and he based a lot of that upon 'Where are you going?['] 'I'm going home.' I believe there was testimony he lived on Pino Way at some point. [¶] . . . [¶] So, anyways, the officer says, 'Where do you live?' [¶] [N.D.] was able to say where he lived. So the officer at that point I believe was justified in asking the driver and asking the passenger to get out of the car and to give the pat down search. I didn't hear the officer give the passenger a pat down search or at least testify to that. [¶] In any event, the officer testifies that at that point no weapons are found in the pat down search. What is clear to the [c]ourt is that the officer initiated the record check on [N.D.] because [N.D.] didn't have a license, didn't have registration. Simultaneously, while filling out the citation for the above code violations, this other patrol car comes onto the scene. The other patrol car had a canine that was going to do the search. So,

8

the search happens. [¶] I think that's a big part of where the [c]ourt is going. As far as the timing goes, I mean, obviously that is important, but I think what really highlights the [c]ourt was that [Officer Medrano] was writing the citation down when the canine came to do the search. And then the canine officer testified that it takes about less than five minutes to conduct the search. [¶] So, with all that being said, the [c]ourt is going to respectfully deny the motion to suppress."

## II. DISCUSSION

A. *Challenge to Vehicle Search and Seizure of Drugs*

N.D. contends the juvenile court erred in denying his suppression motion because the prosecution failed to establish that the police officers had probable cause to search the SUV. N.D. asserts that "when Checo entered [N.D.]'s vehicle in response to Officer Mitchell's redirection to the driver's door and its open window, a 'search' for Fourth Amendment purposes commenced." N.D. further asserts that even if Checo's entry into the SUV could be deemed "instinctual and not facilitated or encouraged by law enforcement," "Checo's sniff of N.D.'s vehicle would be a search: Checo entered the car after Mitchell's direction to the open window; [and] his continued search of it was facilitated by Mitchell repeatedly preventing [Checo's] exit from the vehicle and further directing his search." N.D. additionally claims that "Checo's jump into N.D.'s vehicle does not indicate an alert that could establish probable cause." N.D. asserts that Checo did not engage in "his formal alert behavior of sitting down and looking up at Mitchell . . . until after he had sniffed N.D.'s vehicle from front to back for about 1.5 minutes" and "Checo's behavior prior to jumping into [N.D.]'s car fails to provide the requisite probable cause to justify his extensive search of the vehicle's interior."

The Attorney General responds that Checo's "instinctual entry into [N.D.]'s vehicle was not a search under the Fourth Amendment." The Attorney General contends that Checo's "jump was done 'without assistance, facilitation, or other intentional action by its handler,' so it cannot be said that the government *intended* to have the dog jump inside [N.D.]'s vehicle, much less that the government intended that jump be the precursor to obtaining information inside the car." The Attorney General additionally contends Checo's entry and sniffing inside the SUV was supported by circumstances establishing probable cause, including N.D.'s traffic violation, his failure to present a driver's license, his nervousness, and Checo's stop alongside and leap into the SUV, which was a " 'huge change in behavior.' " The Attorney General asserts that "the dog's behavior outside the vehicle demonstrated its detection of a target odor emanating from inside the vehicle."

1. Standard of Review

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]' [Citation.] 'Although our review of factual determinations is deferential, it is not without limit. Factual determinations must be supported by substantial evidence.' [Citation.] To satisfy the substantial evidence standard, the evidence supporting the trial court's findings must be ' "reasonable, credible, and of solid value." ' " (*People v. Ayon* (2022) 80 Cal.App.5th 926, 937; see also *id.* at pp. 943–944 [conducting an independent review of video evidence in an appeal from the denial of a motion to suppress].)

10

" '[W]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation] and '[a]ny conflicts in the evidence are resolved in favor of the [trial] court's ruling.' [Citation.] Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*People v. Tully* (2012) 54 Cal.4th 952, 979.)

2. Legal Principles

The Fourth Amendment to the United States Constitution guarantees individuals the "right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[6] (U.S. Const., 4th Amend.) "It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment." (*United States v. Jones* (2012) 565 U.S. 400, 404 [holding that the government's installation and use of a GPS device to monitor the movements of a target's vehicle "constitutes a 'search' "]; see also *Byrd v. United States* (2018) 584 U.S. 395, 404–405 [explaining that a person who lawfully possesses a vehicle and exercises control over it has a legitimate expectation of privacy in the vehicle].)

"Warrantless searches are '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' [Citations.] One such exception to the warrant requirement is the automobile exception, which allows for warrantless searches of automobiles where an officer has probable cause to believe the vehicle contains contraband or evidence of a crime. [Citations.] Probable cause to search exists 'where the known facts

---

[6] "The California Constitution similarly protects the 'right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches.' (Cal. Const., art. I, § 13.) But under the so-called truth-in-evidence provision of the state Constitution, ' "issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." ' " (*People v. McWilliams* (2023) 14 Cal.5th 429, 437, fn. 2.)

and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.' [Citation.] An officer who has probable cause to search pursuant to the automobile exception may then conduct a probing search of all 'compartments and containers within the vehicle whose contents are not in plain view.' " (*People v. Moore* (2021) 64 Cal.App.5th 291, 297 (*Moore*).) "The prosecution bears the burden of establishing an exception applies." (*People v. Hall* (2020) 57 Cal.App.5th 946, 951.)

"As the United Stated Supreme Court has noted, 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' [Citation.] Further, '[a]n officer is entitled to rely on his [or her] training and experience in drawing inferences from the facts he [or she] observes, but those inferences must also "be grounded in objective facts and be capable of rational explanation." ' [Citations.] When considering the validity of the evidence, it is to be analyzed ' "as understood by those versed in the field of law enforcement." ' [Citation.] 'The principal components of a determination of . . . probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount . . . to probable cause.' [Citation.] As such, we consider the totality of the circumstances, and analyze these facts as would a reasonable police officer, in assessing the officer's probable cause, rather than looking to singular facts in a vacuum." (*Moore, supra,* 64 Cal.App.5th at pp. 297–298; see also *People v. Ovieda* (2019) 7 Cal.5th 1034, 1052 ["[A]n officer's subjective intent plays no role in the Fourth Amendment inquiry."].)

The United States Supreme Court has stated that "the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' [citation]—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (*Illinois v. Caballes* (2005) 543 U.S. 405, 409 (*Caballes*), quoting *United States v. Place* (1983) 462 U.S. 696, 707; see also *People v. Mayberry* (1982) 31 Cal.3d 335, 341–342; *United States v. Olivera-Mendez* (8th Cir. 2007) 484 F.3d 505, 511 (*Olivera-Mendez*) ["A dog sniff of the exterior of a vehicle does not constitute a search."]; cf. *Florida v. Jardines* (2013) 569 U.S. 1, 11–12 ["The government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment."].)

Moreover, " '[a] dog alert can provide the probable cause needed for a search warrant.' " (*Stillwell*, supra, 197 Cal.App.4th at p. 1006, quoting *People v. Bautista* (2004) 115 Cal.App.4th 229, 236.) "Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." (*Florida v. Harris* (2013) 568 U.S. 237, 246–247 (*Harris*).) "The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or

evidence of a crime. A sniff is up to snuff when it meets that test." (*Id*. at p. 248.)

### 3. Analysis

We begin by considering whether prior to Checo's entry into N.D.'s SUV, an objectively reasonable police officer would have had probable cause to believe the vehicle contained contraband. As we will explain, the answer is yes.

N.D. has raised no challenge to Officer Mitchell's testimony that Checo was trained in the detection of narcotics and firearms. Thus, the evidence provides sufficient reason to trust an alert by Checo. (See *United States v. Collier* (8th Cir. 2024) 116 F.4th 756, 761, citing *Harris*, *supra*, 568 U.S. at pp. 246–247 ["A dog is presumptively reliable at detecting illicit drugs—and its alert establishes probable cause for a search—if the dog has satisfactorily completed a bona fide certification or training program."].)

Considering Officer's Mitchell's body camera video along with his hearing testimony, we are persuaded there is substantial evidence supporting an implied finding that Checo demonstrated an alert for contraband through his change in behavior prior to jumping into the SUV. Preliminarily, we agree with the Attorney General that Mitchell never testified that Checo was trained to alert through a particular alert behavior. Rather, Mitchell testified that changes in Checo's behavior serve as his detection alert. Thus, based on Mitchell's testimony, and in accord with the opinions of other courts, we conclude that behavioral changes exhibited by Checo can serve as a basis for probable cause. (See *United States v. Moore* (10th Cir. 2015) 795 F.3d 1224, 1232 ["We have held that an alert, or a change in a dog's behavior in reaction to the odor of drugs, is sufficient to establish probable cause to search a vehicle, and that a final indication is not necessary."]; see also

14

*United States v. Thomas* (9th Cir. 2013) 726 F.3d 1086, 1098 ["Evidence from a trained and reliable handler about alert behavior he recognized in his dog can be the basis for probable cause.  Whether a particular dog displays enough signaling behavior will depend on the facts and circumstances of each case."]; *People v. Bailey* (Colo. 2018) 427 P.3d 821, 828 [noting a lack of authority supporting the trial court's disregard of evidence related to the canine's "initial alert because it was not a 'final' indication of the odor of narcotics"]; *United States v. Braddy* (11th Cir. 2021) 11 F.4th 1298, 1314 [noting that "other circuits have [] rejected a stricter rule requiring a final response, indication, or alert for a drug dog to be sufficiently reliable"]; cf. *State v. Randall* (2021) 496 P.3d 844, 855 (*Randall*) [explaining it was necessary for the dog's handler to explain why the dog's "behavior was an objectively reliable indication that narcotics were present"].)

Officer Mitchell's body camera video shows a significant change in Checo's behavior immediately before he jumped into N.D.'s SUV.  As discussed *ante* (see pt. I.B.1.) and depicted in the video, Mitchell began the dog-sniffing examination at the left rear corner of the SUV by directing Checo to sit (which he did).  Mitchell then pointed to the left rear wheel area of the SUV and Checo stood up.  Checo briefly lifted his front paws off the ground to

about the height of the rear wheel.[7]



0:02:41

---

[7] The video does not definitively show whether Checo's paws made contact with the SUV at this point.  Nevertheless, a " 'minimal and incidental contact with the exterior of the car [i]s not a tactile inspection of the automobile' " that amounts to a " ' "constitutionally cognizable infringement." ' "  (*Stillwell, supra*, 197 Cal.App.4th at p. 1007, quoting *Olivera-Mendez, supra*, 484 F.3d at pp. 511–512; see also *State v. Mumford* (Iowa 2024) 14 N.W.3d 346, 352 [concluding that a drug dog's placement of its paws on a car door did not violate the Fourth Amendment].)

Checo returned his paws to the ground, walked along the driver's side of the SUV, and then turned in front of the vehicle (with Officer Mitchell trailing behind holding Checo's leash). While Checo was in front of the SUV, Mitchell pointed to the front left corner/bumper area of the SUV as Checo turned around. Checo walked toward Mitchell and moved his nose near the spot toward which Mitchell pointed.



Checo continued forward, walking past the SUV's left front wheel. When Checo got to the area of the SUV's left sideview mirror, he rose up on his hind legs without any prompting from Mitchell. Checo's head reached the height of the mirror and one or both of his front paws briefly contacted the exterior of the SUV (in the area forward of the mirror).



0:02:45

Checo next lowered his paws and jumped into the SUV through its open driver's door window.



0:02:47

18

According to Officer Mitchell's testimony, Checo's movement toward the SUV's door was a "change in behavior" that was consistent with Checo's training "to go as close as possible to be next to that target odor source."

Based on Officer Mitchell's explanation of Checo's typical alerting behavior and Checo rising toward the driver's door mirror and open window without any prompting from Mitchell, we conclude there is substantial evidence supporting an alert by Checo before he leapt through the window of N.D.'s SUV. Checo's behavior outside the SUV immediately prior to Checo's entry into the SUV would make a reasonably prudent person think a search of the vehicle would reveal contraband. (See *United States v. Pulido-Ayala* (8th Cir. 2018) 892 F.3d 315, 319 [concluding that police had probable cause before the dog "actually crossed the threshold into the interior" of the vehicle "given the strong reaction of the trained drug dog while it was *outside* the car, together with [defendant']s suspicious reaction to the drug checkpoint"].)

Because we decide that, under the totality of the circumstances, the police had probable cause to search N.D.'s SUV before Checo entered it, we need not consider whether a canine's "instinctive entry" into a vehicle during an exterior sniffing examination converts what would be a nonsearch under *Caballes*, *supra*, 543 U.S. at p. 409, into a search that must be supported by probable cause. (See *Randall*, *supra*, 496 P.3d at p. 853.)

B. *Correction to Dispositional Order*

Paragraph No. 25 of the juvenile court's dispositional order specifies a maximum time of confinement of "[one] year." Because the court did not remove N.D. from the custody of his parents (and instead ordered him to reside in his mother's custody), the court should not have specified a maximum time of confinement in its dispositional order. (See *In re G.C.* (2020) 8 Cal.5th 1119, 1129; *In re P.A.* (2012) 211 Cal.App.4th 23, 32; *In re*

19

*Matthew A.* (2008) 165 Cal.App.4th 537, 541; § 726, subd. (d)(1).) Accordingly, we will modify the dispositional order to strike the provision setting a maximum confinement time. (See *In re A.C.* (2014) 224 Cal.App.4th 590, 592; *Matthew A.*, at p. 541.)

### III.  DISPOSITION

The juvenile court's February 10, 2025 dispositional order is modified to strike the provision setting the maximum time of confinement at one year (¶ No. 25).  With this modification, the judgment is affirmed.

_____
Danner, J.

WE CONCUR:

_____
Greenwood, P. J.

_____
Chung, J.*

**H053027**
*People v. N.D.*

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.