[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12823

_____

D.C. Docket No. 1:18-cr-00300-CG-MU-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES BERNARD BRADDY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(August 31, 2021)

Before ROSENBAUM, LAGOA, and ED CARNES, Circuit Judges.

LAGOA, Circuit Judge:

James Braddy appeals the district court's order denying his motion to suppress

evidence obtained from a search of his vehicle following a traffic stop by law

enforcement.  Braddy argues that law enforcement lacked reasonable suspicion to initiate the traffic stop, unlawfully prolonged the traffic stop even if there was reasonable suspicion for the initial stop and lacked probable cause to search the vehicle.  After careful review and with the benefit of oral argument, we affirm the district court's denial of Braddy's motion to suppress.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On September 27, 2018, Officer Austin Sullivan pulled over Braddy on Interstate 65 ("I-65") in Saraland, Alabama, after Officer Sullivan observed Braddy react to the presence of his marked patrol vehicle and observed that Braddy's vehicle's license tag was obscured by two bicycles.  During the traffic stop, officers discovered cocaine in Braddy's vehicle following two canine sniffs.  Braddy was subsequently charged by a criminal complaint, and then a federal grand jury indicted him for possession with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846.  Braddy pleaded not guilty to both counts, and the case was set for trial.

On November 19, 2018, Braddy filed a motion to suppress all the evidence seized by law enforcement from the traffic stop that led to his arrest.  Braddy argued that Officer Sullivan's reason for pulling Braddy over—a violation of Ala. Code § 32-6-51, which requires motor vehicle operators to keep their license plates plainly

visible—did not provide probable cause because the statute did not apply to Braddy as a nonresident of Alabama. Braddy also argued that law enforcement lacked reasonable suspicion to go beyond the initial traffic stop, which Braddy asserts occurred when Officer Sullivan questioned Braddy regarding his travel plans, itinerary, residency, and ownership of the vehicle. Braddy asserted that his behavior before being pulled over was not suspicious and that his reaction to Officer Sullivan's presence, his nervousness in interacting with Officer Sullivan, and the bicycles blocking his vehicle tag did not provide reasonable suspicion. Finally, Braddy asserted that the dog sniffs did not provide the officers with probable cause to search his car. In support of this argument, Braddy attached a declaration from Andre Jimenez, who opined that the two dogs were being "over handled" by the officers and did not exhibit "alert/indication behavior."

In response, the government asserted that Officer Sullivan's interpretation of Alabama law was correct but that, even if Officer Sullivan was mistaken in his interpretation of the Alabama statute, the interpretation was objectively reasonable. The government also contended that the dog searches occurred during the time that the appropriate investigation accompanying the traffic stop was still underway, explaining that Braddy: (1) was stopped in a well-known corridor used for interstate shipment of drugs; (2) admitted to not owning his vehicle; (3) immediately claimed to be a brother of a law enforcement officer during questioning, whom Braddy called

3

during the stop; and (4) became increasingly nervous despite being told he would only be issued a warning citation. As such, the government asserted that Braddy's own conduct extended the time of the traffic stop and that, under the totality of the circumstances, there was reasonable suspicion that criminal activity may be afoot. Finally, the government contended that the dog searches established probable cause for the warrantless search of the vehicle, noting that Braddy's expert witness had not opined the dogs were not trained or certified.

In December 2018, the district court held a two-day evidentiary hearing on the motion to suppress, at which Officer Sullivan, Lieutenant Gregory Cully, and Braddy's expert witness, Jimenez, all testified and video evidence of the traffic stop was played.[1] Officer Sullivan testified as to the following. While patrolling I-65, Officer Sullivan observed Braddy, who was driving a black Ford Expedition in a relaxed manner, immediately sit up, become rigid, and fixate his focus on the road after Braddy saw the officer's patrol unit. Officer Sullivan also observed that Braddy's license plate was obscured by two bicycles and could only discern that it was a Florida tag. Officer Sullivan then initiated a traffic stop, explaining to Braddy why he pulled him over and asking for his license, registration, and proof of insurance. Officer Sullivan could tell Braddy was "extremely nervous," as Braddy

---

[1] Officer Taylor's body camera video and Officer Sullivan's police vehicle dash cam video were both entered into evidence without objection.

did not make eye contact and stated that his brother was a police officer. Officer Sullivan had Braddy exit the vehicle and come to his patrol car because the information on Braddy's driver's license was not correct, and he needed the correct information to issue Braddy a warning citation. Braddy also indicated that he did not own the vehicle he was driving.

As part of his routine records check in any traffic stop, Officer Sullivan performs a computer check for active arrest warrants and information on the vehicle. During this traffic stop, while Officer Sullivan went through his routine records check, additional officers arrived, including Lieutenant Cully and Officer Dan Taylor. Officer Sullivan asked Lieutenant Cully, a certified dog handler, to run his drug detection dog around Braddy's vehicle while he waited for the warrants check on Braddy. While waiting for the warrant check, Officer Sullivan observed Lieutenant Cully's drug detection dog go into "odor response" while passing the driver's side door. Lieutenant Cully did not notice the response because he was paying attention to the traffic along the interstate. Because Officer Sullivan had previously trained with Lieutenant Cully, he was familiar with how Lieutenant Cully's dog would act when indicating a drug odor. Officer Sullivan exited his patrol car to tell Lieutenant Cully, and Officer Taylor continued with the traffic citation. Officer Sullivan ran his own drug detection dog around Braddy's vehicle, and his dog likewise indicated a drug odor coming from the driver's side. Specifically,

5

Officer Sullivan explained his dog gave a "canine alert" by leaning its body forward, closing its mouth, and changing its breathing and body posture, with the dog's tail becoming erect. The dog, however, was unable to go into its trained "final response," as it was not able to directly pinpoint the odor.

Regarding Braddy's behavior during the stop, Officer Sullivan heard Braddy's phone ring as he approached the vehicle, and Braddy engaged in multiple other phone calls with his brother, the alleged police officer, despite being told multiple times to hang up the phone. Officer Sullivan described Braddy's behavior as aggressive, evasive, and "deceptive" and believed the person on the phone was "coaching him along." Braddy also gave his exact location to the person he was speaking to, which Officer Sullivan considered dangerous based on his experience patrolling I-65. Although Officer Sullivan told Braddy early into the stop that he was only going to give him a warning, Braddy continued to act nervous, failed to make eye contact, and tried to distance himself from the officers. After Officer Sullivan asked Braddy if all the items in the vehicle belonged to him, Braddy denied ownership of two brown duffel bags, which he attributed to another driver of the vehicle, and did not claim direct ownership of the bicycles.

On cross-examination, Officer Sullivan stated that reasonable suspicion of criminal activity began when Braddy reacted to his patrol vehicle and immediately changed his posture. He admitted that Braddy provided his driver's license in the

6

first four minutes and twenty-eight seconds of the stop, although the license did not have the correct address. Braddy did not hand Officer Sullivan his registration and insurance until thereafter because Braddy "had to dig around for them." He explained that he did not run Braddy's information until after more than six minutes into the stop because he was asking Braddy questions. His questions were prompted by the fact that Braddy appeared extremely nervous, had his arms crossed, was not making eye contact, and was stuttering badly. More than six minutes into the stop, Officer Sullivan asked Braddy to sit in his car so that he could run Braddy's information into certain databases. Because it was "first thing in the morning," Officer Sullivan had to log in and get his computer "up and running." Officer Sullivan then began to input the information into several databases while also continuing to question Braddy. While Braddy never gave him conflicting information, Officer Sullivan believed, based on his training and experience, that Braddy was acting in a deceptive manner and was hostile based on his evasive answers. After twelve minutes into the stop, he continued entering Braddy's information into his computer. Officer Sullivan said that Braddy told him he was "scared" and asked permission to call his brother. At that point, Officer Sullivan later admitted, Braddy was not free to leave. Officer Sullivan then asked Braddy if there was cocaine or marijuana in his car, which "escalated" the stop. At this point, Officer Sullivan believed that he had reasonable suspicion of criminal activity.

7

Braddy denied consent for the officers to search his vehicle, although the drug detection dogs were already deployed. Braddy began talking on his phone and refused to get off the phone despite Officer Sullivan asking him to do so several times. Based on Braddy's suspicious behavior, and his criminal history, which a database search had turned up, and the fact that two dogs alerted to the presence of narcotics in the vehicle, Officer Sullivan handcuffed Braddy. He testified that he did so "for our safety and his safety."

Officer Sullivan also testified to his training for handling drug detection dogs. Officer Sullivan was assigned to handle a police dog. He stated that he and his drug detection dog had a National Police Canine Association certification, that his dog, at the time of purchase, was already trained and had a previous handler, and that the dog's alert at the presence of narcotics was "a change of breathing, a change of body posture, and then a final response," which was an "aggressive alert." As to Lieutenant Cully's dog's "response," Officer Sullivan explained that the video evidence showed the dog, which had not been told to search, changed its mouth and body posture, stopped wagging and straightened its tail, turned its body to be "squared up with the car," and began lifting his paw up before Lieutenant Cully tripped over the dog. Officer Sullivan explained that, in accordance with his training, this behavior was a sufficient alert to give the officers the ability to search the vehicle. Officer Sullivan also described his own dog's alert on Braddy's vehicle,

8

explaining that the video showed the dog stop by the driver's side, with its "body bladed towards the car, front paws pushed forward, mouth closed," but that the dog was unable to pinpoint the source because of the wind. On redirect examination, Officer Sullivan stated that he received criminal history on Braddy and that, when questioned, Braddy did not "recall" having been arrested before.

The government then called Lieutenant Cully, who testified to the following. Lieutenant Cully, who had served twenty-two years as a police officer and became a canine officer in 2007, completed multiple trainings and certifications with his drug detection dog. Lieutenant Cully reviewed the dash-cam video and determined that Officer Sullivan was correct that his dog alerted to the presence of a drug odor. Lieutenant Cully explained his dog's behavior for alerting the presence of a drug odor, which corresponded with Officer Sullivan's description. He further explained that he observed Officer Sullivan's dog's response, which he was familiar with because they trained together all the time. Lieutenant Cully also thought that Braddy acted "[e]xtremely nervous" during the traffic stop, as he had difficulty answering basic questions and "the color drained out of his face" when Braddy was told the officers were going to take the back seat out of his vehicle. On cross-examination, Lieutenant Cully discussed his dog training and certification and admitted that he had missed seeing his dog alert a few times. Lieutenant Cully also stated that he saw his dog alert at Braddy's passenger-side door but did not tell any of the officers at

9

that time.  Lieutenant Cully explained on re-direct that he did not mention his dog's positive response because he did not want to influence another handler—Officer Sullivan—who was about to search the vehicle.

Braddy called Jimenez as an expert witness, who testified to the following. Jimenez explained that he had worked with police dogs since 1984, served as a police officer for twenty-one years, and currently owns a business that trains dogs for detection work.  Jimenez had testified as a qualified expert witness between forty-five to fifty times.  Jimenez reviewed the police reports, the certificates and training records of Officer Sullivan and Lieutenant Cully, and the videos from Braddy's arrest to help form his opinion.  Jimenez explained the process that he uses to train dogs, his opinion on best practices to train a police dog, and the differences between a passive and aggressive alert.  Jimenez opined that the two officers made numerous errors while they walked their dogs around Braddy's vehicle, including "overhandling" their dogs by jerking on their chains, distracting them by giving extra commands, and confusing the dogs to do things not related to the "odor," and that better training needed to be conducted.  Jimenez also opined that the dogs' behaviors of wagging their tails or closing their mouths was not a valid indicator for smelling a narcotic order.  On cross-examination, Jimenez admitted that he received payment for the training he provides and for serving as an expert witness.   He also

10

acknowledged that various other courts had rejected his testimony in multiple other cases.

In response to Jimenez's testimony, the government again called Officer Sullivan, who explained his certifications and reinforced that his dog's alert comes when the dog has a "change in breathing, change in body posture" and also a "final response." He stated that his dog had a change in breathing and body posture when he ran his dog around Braddy's car. Officer Sullivan also noted that hidden compartments presented an issue given his dog's training and that there was a concealed compartment in Braddy's vehicle containing the drugs.

On January 29, 2019, the district court denied the motion to suppress. The district court first rejected Braddy's argument that there was no probable cause for the traffic stop because Alabama Code § 32-6-51 did not apply to him. The district court determined that even if Alabama law did not prohibit a nonresident driver from obscuring portions of his license plate, Officer Sullivan's literal interpretation of the statute was objectively reasonable and therefore Officer Sullivan had probable cause to conduct the traffic stop.

Turning to Braddy's argument that the police did not have reasonable suspicion to prolong the traffic stop or to conduct a general criminal investigation, the district court found that the officers' questions about Braddy's travel plans were "ordinary inquires incident to a traffic stop." The district court noted that Braddy

11

"reportedly exhibited extreme nervousness" even after he was told he would only be receiving a warning citation rather than a ticket. After addressing the evidence presented at the suppression hearing, the district court found that "Officer Sullivan had reasonable suspicion based on [Braddy's] behavior and extreme nervousness, [Braddy's] apparent difficulty in explaining his travel plans and circumstances[,] and the irregularities with [Braddy's] driver's license and vehicle." Prior to the alerts, the district court found that "Officer Sullivan stayed within the mission of the traffic stop by addressing the traffic violation that warranted the stop and attending to related safety concerns" and that "the stop lasted no longer than was necessary to complete the mission until a reasonable suspicion arose" that justified further investigation by the officers. The district court further found that the "officers did not conduct unrelated inquiries aimed at investigating other crimes that added to the stop until they had reasonable suspicion" based on Lieutenant Cully's canine alert on Braddy's vehicle, which "was further substantiated when [Officer] Sullivan's canine [also] alerted."

Finally, the district court rejected Braddy's argument that the officers lacked probable cause to search the vehicle. The district court explained that the officers testified that the dogs were trained and certified and noted that Jimenez's testimony had previously been found not credible by four other courts. Thus, the district court found that there was sufficient evidence showing that the drug detection dogs were

12

reliable and credited the officers' testimony that the dogs alerted to the odor of narcotics in Braddy's vehicle "in a way that was consistent with the officers' and the canines' training and certification." The district court therefore concluded that the officers had probable cause to search the vehicle.

On February 1, 2019, Braddy filed a motion to waive his right to a jury trial, explaining that he would admit guilt but sought to maintain his right to appeal the order denying the suppression motion. The parties also submitted the following stipulated facts: Officer Sullivan, while driving a marked police vehicle, observed Braddy operating a vehicle on Interstate 65. Officer Sullivan observed Braddy move from a relaxed driving posture to a more rigid posture as he passed Braddy's vehicle. Officer Sullivan observed two bicycles attached to the rear of Braddy's vehicle, which partially obscured the license plate. Officer Sullivan stopped the vehicle based on a violation of Alabama law relating to the requirement for a plainly visible license plate. During the stop, Officer Sullivan and other officers developed information that resulted in the search of the vehicle, where they discovered approximately sixty-two kilograms of cocaine and a bag containing approximately $40,000 in cash.

After granting the motion to waive a jury trial, the district court held a bench trial and found that there was sufficient evidence to convict Braddy beyond a reasonable doubt on both counts. On the same day, the district court entered a

13

written order finding Braddy guilty as charged in Count One and Count Two of the Superseding Indictment. On July 10, 2019, the district court sentenced Braddy to 121 months' imprisonment. This appeal ensued.

## II. STANDARD OF REVIEW

A district court's denial of a motion to suppress involves mixed questions of law and fact. *See United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). We review the district court's findings of fact for clear error and the district court's application of the law to those facts *de novo*. *Id.* We construe factual findings in the light most favorable to the prevailing party. *Id.* We, however, "are not restricted to the evidence presented at the suppression hearing, and instead consider the whole record." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

## III. ANALYSIS

On appeal, Braddy asserts that the district court erred in denying his motion to suppress. In support of this contention, he raises the following three arguments: (1) that Officer Sullivan lacked probable cause to make the traffic stop because he incorrectly applied Alabama law to a nonresident Florida driver and that the mistake was not objectively reasonable; (2) that even if the stop was justified and legal, Officer Sullivan illegally prolonged the traffic stop without reasonable suspicion to do so; and (3) that the two police dogs that performed dog sniffs on the vehicle did

not have a positive alert to justify the search of the vehicle. We address these arguments in turn.

### A. Whether the traffic stop of Braddy was lawful

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop for a suspected violation of law is considered a seizure of the vehicle's occupant and must be conducted in accordance with the Fourth Amendment. *See Heien v. North Carolina*, 574 U.S. 54, 60 (2014). To justify this type of seizure, however, "officers need only 'reasonable suspicion'— that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Id.* (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). Indeed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Id.* (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)). As the Supreme Court has explained, "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Id.* at 60–61 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). A mistake may be of either fact or law so long as that mistake is "*objectively* reasonable"; a reviewing court does not look at "the subjective understanding of the particular officer involved." *Id.* at 66 (emphasis in original). The inquiry for objective reasonableness "is not as forgiving as the one employed in the distinct context of

15

deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation," meaning that "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty bound to enforce." *Id.* at 67.

Braddy argues that Officer Sullivan lacked probable cause to conduct the traffic stop because Alabama Code § 32-6-51 does not apply to Braddy as a nonresident motorist and Officer Sullivan's contrary interpretation of the statute was not objectively reasonable. We disagree.

Alabama Code § 32-6-51 provides, in relevant part, that:

> Every motor vehicle operator who operates a motor vehicle upon any city street or other public highway of or in this state shall at all times keep attached and plainly visible on the rear end of such motor vehicle a license tag or license plate as prescribed and furnished by the Department of Revenue at the time the owner or operator purchases his license.

It is undisputed that the bicycles on the back of Braddy's vehicle at least partially obstructed the vehicle's license plate, which Officer Sullivan was able to identify as a Florida tag. Braddy, however, claims that this statute is inapplicable to him as a nonresident based on Alabama Code § 40-12-262(a), which provides, in relevant part:

> The provisions of the foregoing sections relative to registration and display of registration numbers shall not apply to a motor vehicle owned by a nonresident of this state and not used for hire or used for commercial purposes in this state for a period of 30 days from date of entering the state; provided, that the owner thereof shall have complied

with the provisions of the law of the foreign country, state, territory, or federal district of his residence relative to the registration of motor vehicles and the display of registration numbers thereon and shall conspicuously display his registration number as required thereby . . . .

Braddy asserts that § 40-12-262 precludes all Alabama statutes governing the placement of vehicle license plates and tags, such as § 32-6-51, from applying to nonresident motorists. He further notes that, under Alabama law, license plate and tag statutes are typically strictly construed against the State of Alabama. *See, e.g.*, *State v. Green*, 371 So. 2d 929, 930 (Ala. Civ. App. 1979).

We need not determine whether Braddy's interpretation of the relevant Alabama statutes is correct because, even assuming § 32-6-51 does not apply to nonresident motorists, we find Officer Sullivan's contrary interpretation to be objectively reasonable. Our decision in *United States v. McCullough*, 851 F.3d 1194 (11th Cir. 2017), is instructive on this issue. In that case, the defendant's truck was outfitted with a bracket that covered the invocation and state of issue of his Alabama license plate. *Id.* at 1197. An officer pulled over the defendant on the belief that the defendant was in violation of § 32-6-51, and the traffic stop escalated into a search of the defendant's vehicle that revealed the presence of marijuana and a handgun. *Id.* at 1197–98. The defendant filed a motion to suppress that evidence, which the district court denied. *Id.* at 1198. On appeal, the defendant argued that his traffic stop was unlawful because, under Alabama Code § 40-12-242, only the alphanumeric symbols of a license plate were required to be plainly visible. *Id.* at

17

1201. We did not decide whether the defendant's interpretation of the Alabama Code was correct because, even if that interpretation was correct, the officer's contrary conclusion was objectively reasonable under *Heien*. *Id.* We explained that the language of § 32-6-51 left "open the possibility that more than the alphanumeric symbols must be plainly visible." *Id.* We further noted that "reading both statutes together . . . support[ed] the conclusion that the officer's interpretation was reasonable" and that "[t]he absence of any limit in section 32-6-51 suggests the section applies to more than alphanumeric symbols." *Id.*

Here, Officer Sullivan testified that he stopped Braddy because the bicycles were obstructing the license plate on Braddy's vehicle based on his interpretation of Alabama law. Officer Sullivan's interpretation of Alabama law was objectively reasonable for several reasons. The plain language of § 32-6-51, which is the starting point for questions of statutory interpretation, *see Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1260 (11th Cir. 2020); *Ex parte Brandon*, 113 So. 3d 638, 641 (Ala. 2012), states that "*every* motor vehicle operator" must have a license plate or tag "plainly visible" on his or her vehicle. Ala. Code § 32-6-51 (emphasis added). Section 32-6-51 does not contain any language limiting its application to only Alabama residents nor does the language of § 32-6-51 cross-reference § 40-12-262 or title 40 of the Alabama Code. Nor is it clear that § 40-12-262 applies to other titles of the Alabama Code outside of title 40. Thus, the text of the two statutes

18

"leaves open the possibility" that § 32-6-51 applies to nonresident motorists. *See McCullough*, 851 F.3d at 1201.

Furthermore, § 40-12-262 requires a nonresident motorist to comply with the provisions of the law of the state of his residence and to "conspicuously display his registration number as required thereby." Under Florida law, which is the state of registration of Braddy's vehicle, a vehicle's license plate must be displayed in the rear of the vehicle such that "all letters, numerals, printing, writing, the registration decal, and the alphanumeric designation shall be . . . plainly visible and legible at all times." Fla. Stat. § 316.605(1). Thus, even if Officer Sullivan was mistaken that § 32-6-51 applied, Braddy was still in violation of § 40-12-262 by obstructing the view of his Florida license plate in violation of § 316.605(1), Fla. Stat.

Because this case does not implicate an officer's "sloppy study of the laws" that the Supreme Court cautioned courts about in *Heien*, s*ee* 574 U.S. at 67, we hold that any mistake of law by Officer Sullivan was objectively reasonable and we further hold that the traffic stop by Officer Sullivan of Braddy's vehicle was based on probable cause and therefore lawful. We now turn to address Braddy's second argument—whether Officer Sullivan unlawfully prolonged the traffic stop that led to the search of Braddy's vehicle.

## B. Whether law enforcement unlawfully prolonged the traffic stop

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The police, however, do not have unfettered authority to detain a person indefinitely, and "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350; *accord United States v. Vargas*, 848 F.3d 971, 973 (11th Cir. 2017). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citation omitted). "The scope of the detention must be carefully tailored to its underlying justification" and may "last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354.

As we have explained, "we measure the reasonableness of a stop's duration under the totality of the circumstances," and "[r]igid time limitations and bright-line rules are generally inappropriate." *United States v. Holt*, 777 F.3d 1234, 1256 (11th Cir. 2015) (alteration in original) (quoting *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001)). In other words, to determine the reasonable duration of a traffic stop, we look to whether the police diligently pursued the investigation.

20

*United States v. Sharpe*, 470 U.S. 675, 686 (1985). In the context of a traffic stop, the Supreme Court identified a number of tasks "[b]eyond determining whether to issue a traffic ticket" that are "ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 575 U.S. at 355 (second alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). These inquiries typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*

An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop" so long as the officer does "not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*; *accord Caballes*, 543 U.S. at 406–08; *see also United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003) ("A traffic stop may be prolonged where an officer is able to articulate a reasonable suspicion of other illegal activity beyond the traffic offense."). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification" for making the stop. *Perkins*, 348 F.3d at 970 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). In determining whether reasonable suspicion is present, we "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal

21

wrongdoing." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). In examining the totality of the circumstances, this Court gives "due weight to the officer's experience." *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991). However, "an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity" does not satisfy the reasonable suspicion standard. *Perkins*, 348 F.3d at 970 (quoting *Wardlow*, 528 U.S. at 124).

Braddy contends that Officer Sullivan unlawfully prolonged the traffic stop by engaging in nontraffic stop activities, including conducting probative questioning about his travel plans and itinerary, his residency, and the ownership of his vehicle as well as the dog sniffs. As to Braddy's assertions that Officer Sullivan's "probative questioning" prolonged the stop, we conclude that that the district court did not err in determining that Officer Sullivan's questions were related to the purpose of the traffic stop and did not unlawfully prolong the traffic stop. Generally, questions related to an individual's traffic plans or itinerary are ordinary inquires related to a traffic stop. *See United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) ("[O]ur case law allows an officer carrying out a routine traffic stop . . . to inquire into the driver's itinerary."); *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (en banc) ("An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop. . . . [T]hese inquiries are within the scope of investigation attendant to the traffic stop."); *United States v. Givan*, 320 F.3d 452, 459 (3d Cir.

22

2003) ("[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."); *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). Officer Sullivan's questions about Braddy's travel plans and itinerary were therefore ordinary inquiries related to the traffic stop, especially given the fact that Braddy was driving a vehicle on Alabama roads with an obstructed Florida license plate that was not registered to him. Similarly, questions about the address on Braddy's driver's license, which Officer Sullivan determined was incorrect, and questions about the ownership of the vehicle Braddy was driving were also well within the scope of the traffic stop. *See Rodriguez*, 575 U.S. at 355; *Holt*, 777 F.3d at 1256.

We turn next to Braddy's assertion that the dog sniffs unlawfully prolonged the traffic stop. In *Rodriguez*, the Supreme Court stated that the "critical question" in whether a traffic stop is prolonged beyond the point that is unlawful "is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'" 575 U.S. at 357. Here, the district court found that the traffic stop was not unlawfully prolonged by the initial sniff of Lieutenant Cully's dog. The uncontroverted testimony from the suppression hearing established that the canine unit arrived, and the initial dog sniff occurred when Officer Sullivan was engaged in conducting a routine records check

23

during the traffic stop.  Specifically, while Officer Sullivan was in his patrol car waiting for a warrant check return on Braddy before finalizing the issuance of a warning citation for the obstructed license plate, Lieutenant Cully arrived at the scene with his dog and ran the dog around Braddy's vehicle.  As this Court held in *Holt*, "the use of the canines to sniff the exterior of the vehicles during the course of lawful traffic stops did not offend the Fourth Amendment" when the uncontroverted testimony establishes that the canine units arrived while the officers  were still conducting routine records checks and preparing the traffic citations.  777 F.3d at 1257.  Moreover, after Lieutenant Cully's dog alerted to the odor of narcotics, the officers had reasonable suspicion of other criminal activity at that point to prolong the traffic stop.  Prior to the sniff, no additional time was added to the traffic stop other than necessary for conducting the routine records check necessary for the issuance of and preparation of a traffic citation.  We therefore conclude that the district court did not err when it found that Officer Sullivan did not unlawfully prolong the traffic stop.

C. **Whether there was probable cause to search Braddy's vehicle based on the reliability of the drug detection dogs' alerts**

Finally, Braddy contends that the officers lacked probable cause to search his vehicle because the officers' drug detection dogs' alerts were not sufficiently reliable.  A police officer has probable cause to conduct a search of a vehicle "when 'the facts available to [him] would "warrant a [person] of reasonable caution in the

24

belief'" that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (alterations in original) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)). The test for determining probable cause cannot be reduced to "precise definition or quantification," *id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)), and all the Supreme Court requires is "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act,'" *id.* at 244 (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 238 (1983)). In evaluating whether there is probable cause to conduct a search, courts look to the totality of the circumstances. *Id.*

A drug detection dog's alert can provide probable cause to conduct a search. *Id.* at 246–48; *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993). The Supreme Court has rejected the approach of a "strict evidentiary checklist" to assess a drug-detection dog's reliability. *Harris*, 568 U.S. at 244–45. Instead, the Court has explained that "a probable-cause hearing focusing on a dog's alert should proceed much like any other," i.e., "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 247–48. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 246. A defendant, however, can challenge such evidence "by cross-examining the testifying

25

officer or by introducing his own fact or expert witness[]" to contest the adequacy of a certification or a training program or how the dog or handler performed in that program. *Id.* at 247. Additionally, "circumstances surrounding a particular alert may undermine the case for probable cause," e.g., if the officer, consciously or not, cued the dog or if the team was working under unfamiliar conditions. *Id.*

We hold that the officers' two drug detection dogs were sufficiently reliable to provide probable cause for the officers to search Braddy's vehicle. Both Officer Sullivan and Lieutenant Cully testified in detail about the training and certifications that they and their drug detection dogs obtained. Officer Sullivan also explained that he was familiar with the alert of Lieutenant Cully's drug detection dog, as he had previously trained with Lieutenant Cully. This record evidence provides sufficient reason to trust the drug detection dogs' alerts. *See Harris*, 568 U.S. at 246–47.

Braddy, however, argues that the district court should have credited the opinions of his expert witness, Jimenez, who testified that the dogs did not perform a trained alert indicating the presence of drug odors and that the officers "overhandled" their dogs. He contends that, based on this testimony, the district court should have found that the drug detection dogs were not sufficiently reliable to give the officers probable cause to search the vehicle. This argument is without merit. In the context of a motion to suppress, we review the district court's findings

26

of fact for clear error, "constru[ing] all facts in the light most favorable to the party that prevailed in the district court and afford[ing] substantial deference to a factfinder's credibility determinations." *Holt*, 777 F.3d at 1255. Thus, "[w]e accept the factfinder's choice of whom to believe 'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it.'" *Id.* at 1256 (quoting *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002)).

Reviewing the record, we conclude that the district court's finding in crediting the officers' testimony over the testimony of Braddy's expert was not clearly erroneous. In crediting the officers' testimony, the district court noted that the officers' version of events was consistent with the video evidence and the officers' explanation of their training. The district court found that "the officers were in a better position to observe and judge the actions of their canines both because they were in close proximity at the scene and because of their history of extensive training and familiarity with their canines." Indeed, the officers specifically testified about their drug detection dogs' responses on Braddy's vehicle. Officer Sullivan explained that when he ran his dog by the vehicle, the dog "bladed his body towards the car, closed his mouth, tail went erect, and [he] saw a change in breathing and change in body posture, showing the presence of narcotics in the vehicle." He described the

27

dog's behavior as "very quick" and explained that he had seen this behavior on "many" occasions, which was consistent with the dog's behavior during training.

Officer Sullivan further explained that his dog could not go into "final response" because it could not pinpoint the odor's source due to the wind conditions at the scene, but that the dog's changes in behavior were responses indicating the presence of drugs. As to Lieutenant Cully's dog, Officer Sullivan testified that he witnessed the dog go into odor response, which he described as the dog's mouth and body posture changing, its tail becoming a little straight, its body turning "squared up with the car," and its paw beginning to lift. Lieutenant Cully also testified about his drug detection dog's behavior, explaining that he was trained to look for the dog's "change in body posture and a change in breathing" leading to the dog's paw scratch as a "final response." Lieutenant Cully explained that he viewed the video evidence of the traffic stop and observed his drug detection dog on video perform all those behavioral changes up until the point of the dog beginning to raise his paw.

Our dissenting colleague contends that the officers lacked probable cause because they relied on their subjective interpretations of the drug detections dogs' "ambiguous and general" behavior to justify their search of Braddy's vehicle and that the described behavior is not captured by the video evidence. However, whether the video evidence can or cannot confirm the dogs' behavior that the officers described is not dispositive to the issue. For example, in *United States v. Parada*,

28

577 F.3d 1275, 1281 (10th Cir. 2009), the Tenth Circuit affirmed the district court's

finding that an officer's drug detection dog alerted on the defendant's vehicle, as the

defendant had not shown clear error. While acknowledging that "the quality of the

videotape [in evidence was] poor," the Tenth Circuit noted that the officer had

testified as to his dog's alert behavior and that his dog had alerted on the vehicle,

which the district court found credible. *See id.* Although the dissent asserts that the

officers were subjectively interpreting their dogs' ambiguous and general behavior,

our review of the district court's factual findings, including its credibility

determinations, as to whether the dogs alerted is for clear error, "accept[ing] the

factfinder's choice of whom to believe 'unless it is contrary to the laws of nature, or

is so inconsistent or improbable on its face that no reasonable factfinder could accept

it.'" *See Holt*, 777 F.3d at 1255–56 (quoting *Ramirez-Chilel*, 289 F.3d at 749 (11th

Cir. 2002). Indeed, it was the province of the district court to observe and assess the

officers' testimonies on their drug detection dogs' behaviors and to determine

whether to credit their testimonies. *See Ramirez-Chilel*, 289 F.3d at 749. Here, the

district court explained that "the officers were in better position to observe and judge

the actions of their canines both because they were in close proximity at the scene

and because of their history of extensive training and familiarity with their canines."

As such, the district court found that the drug detection dogs were reliable and

credited the officers' testimony that the dogs alerted to the odor of narcotics in

29

Braddy's vehicle "in a way that was consistent with the officers' and the canines' training and certification." Having reviewed the record, we conclude that the district court did not clearly err in its findings.

Braddy further argues that the drug detection dogs were not sufficiently reliable to provide probable cause because they did not perform a "final" alert or response on Braddy's vehicle. We decline to adopt this rigid standard as there is no "strict evidentiary checklist" for assessing whether a drug detection dog is sufficiently reliable. *Harris*, 568 U.S. at 244–45 (rejecting the Florida Supreme Court's decision requiring an evidentiary checklist for proof of a canine's results in the field). Requiring a drug detection dog to give a final response to demonstrate its reliability would be contrary to the Supreme Court's explanation that determining probable cause is "a more flexible, all-things-considered approach," i.e., "a fluid concept—turning on the assessment of probabilities in particular factual contexts— not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 244 (quoting *Gates*, 462 U.S. at 232). Indeed, other circuits have similarly rejected a stricter rule requiring a final response, indication, or alert for a drug dog to be sufficiently reliable. *See United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) ("Thus, the general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause. We decline to adopt the stricter rule urged by [the defendant], which would require the dog to give a final indication before

30

probable cause is established. . . .We hold that probable cause was satisfied by [the dog's] alert to the odor of an illegal substance in the vehicle and that it was not necessary for the dog to indicate the exact source of that odor."); *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013) (finding *Parada*'s rejection of the final alert rule to be "on the mark," as "probable cause is measured in reasonable expectations, not certainties," and noting that *Harris* "confirms the correctness of this view"). As the Supreme Court concluded in *Harris* "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." 568 U.S. at 246–47. We therefore conclude that the district court did not err in finding that the drug detection dogs' alerts were sufficiently reliable to provide probable cause for the officers to search Braddy's vehicle and affirm as to this issue.

## IV.    CONCLUSION

For the reasons discussed, we affirm the district court's denial of Braddy's motion to suppress.

**AFFIRMED.**

31

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

I concur in much of the panel's opinion.[1]  I write separately to dissent only with respect to the panel's discussion of the kind of behavior a drug-sniffing dog must exhibit to support probable cause.

Here, Officer Sullivan testified that he saw the dogs exhibit an "odor response" indicating the presence of narcotics.  He explained that the dogs give an odor response by changing their breathing, changing their body posture, closing their mouths, or stiffening their tails.  He also said that these subtle behavioral changes occur within a "split second."  The panel concludes that Officer Sullivan's descriptions of his "split second" observations were sufficiently reliable to provide probable cause for the officers to search Braddy's vehicle.

I respectfully disagree.  Here, the officer's descriptions of his observations did not include the kind of objective and articulable facts that are necessary to support a finding of probable cause.  Probable cause is an objective standard.  *District of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.2 (2018); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (explaining that probable cause is assessed "from the standpoint of an objectively reasonable police officer").  And a finding of probable

---

[1] I concur in the majority's holding that the initial decision to stop Braddy was lawful and that Officer Sullivan did not unlawfully prolong the traffic stop.

cause must be based on objective, articulable, and specific facts. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968) (noting that officers "must be able to point to specific and articulable facts"); *see also United States v. Babcock*, 924 F.3d 1180, 1187 (11th Cir. 2019) (explaining that officers are required to have "specific, articulable, and objective facts"); *United States v. Gonzalez*, 969 F.2d 999, 1003 n.6 (11th Cir. 1992) (emphasizing that a probable cause determination must be decided on "the objective facts available to the officers" at the time of the search).[2]

But Officer Sullivan's observations of the drug dogs' behavior are closer to the kind of "inarticulate hunches" that the Fourth Amendment forbids. *See Terry*, 392 U.S. at 22. The behavior he describes—a slight change in posture or breathing, particularly one that is said to happen within a fraction of a second—is described at such a high-level of generality, it could easily refer to normal dog behavior. True, the district court concluded that the dash-cam video here confirmed the officers' testimony. Perhaps it did, but most respectfully, despite multiple attempts, I can't see it. The dogs moved around the vehicle with such pace that it would be hard to isolate any specific behavior. And as Officer Sullivan explained, the response behavior occurred in a "split second," making it even more difficult to confirm any

---

[2] *Terry* and *Babcock* are cases about the reasonable-suspicion standard. But both tests turn on the same set of factors, and both are objective. *Ornelas*, 517 U.S. at 695-97. And notably, the standard for reasonable suspicion is *lower* than that for probable cause. *Alabama v. White*, 496 U.S. 325, 330 (1990). So if stated facts are not enough to satisfy the reasonable-suspicion standard, they certainly are not sufficient to meet the probable-cause standard.

of the key indicators. *Cf. United States v. Boyce*, 351 F.3d 1102, 1108 (11th Cir. 2003) (finding that a district court clearly erred in crediting an officer's testimony that was "belie[d]" by a "videotape" of the encounter at issue).

The government urges us to accept the officers' observations since they are trained to spot these subtle and imperceptible changes in behavior. But an officer's subjective interpretations about the evidence have no place in our analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); *Rankin v. Evans*, 133 F.3d 1425, 1433-34 (11th Cir. 1998) (explaining that "this Circuit explicitly rejected the idea that subjective belief of the arresting officer is relevant to the determination of whether probable cause exists").

And placing our blind faith in the officers' subjective interpretations of common dog behavior—especially when the same behavior occurs routinely in dogs who are not drug-sniffing canines—would effectively insulate law enforcement from judicial scrutiny. Without objective evidence, we cannot assess the reasonableness of a given search or seizure. *Beck v. Ohio*, 379 U.S. 89, 96 (1964) ("If the court is not informed of the facts upon which the arresting officers acted, it cannot properly" assess whether probable cause exists). That is so because we cannot determine whether law enforcement had an "objective justification" for their

34

conduct. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The government's position would render judicial review of searches and seizures all bark and no bite.

But we cannot abdicate our role so easily. The protections of the Fourth Amendment become "meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21. Absent meaningful judicial review, law-enforcement officers could use their subjective beliefs as a license to invade the privacy of the citizenry at will. As the Supreme Court has made clear "good faith on the part of the arresting officers is not enough" because if it were, "the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Beck*, 379 U.S. at 97.

Other courts, wary of this possibility, have not allowed officers to rely on ambiguous dog behavior to justify a search. The Fifth Circuit held that a drug dog's "casting"—"not a strong alert, but something that temporarily stops him and deters his attention at that point"—was "too distantly related to an alert to create reasonable suspicion on its own as a matter of law." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998). And at least two district courts have held that probable cause cannot be based on an "officer's subjective interpretations of a dog's ambiguous behavior."

*See United States v. Heir*, 107 F. Supp. 2d 1088, 1097 (D. Neb. 2000); *see also*

*United States v. Wilson*, 995 F. Supp. 2d 455, 475 (W.D.N.C. 2014) ("A court cannot

accept a handler's subjective determination that a dog has made some otherwise

undetectable alert, which conclusion would be, for all practical purposes, immune

from review.").

As the majority points out, other courts have held that officers can rely on

behavior that is less than a final alert or "final indication" to establish probable cause.

*See United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009); *United States v.

Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013).  A final alert is when a drug dog

makes an obvious or definitive signal.  For example, Officer Sullivan explained that

the final alert for the dogs used in this case is a paw scratch.

I do not disagree with these decisions.  An indication by a dog that is

something less than a final alert but is nonetheless objectively definitive may be

sufficient to provide probable cause.  But "[w]hether a particular dog displays

enough signaling behavior will depend on the facts and circumstances of each case."

*Thomas*, 726 F.3d at 1098.  Here, to justify their search of Braddy's vehicle, the

officers relied on their subjective interpretations of ambiguous and general behavior

that occurred within a "split second" and that, at least to my review, do not appear

to be captured in video footage of the supposed alert behavior.  I think the Fourth

36

Amendment demands more, so I would find that officers lacked probable cause to

search Braddy's vehicle, and I would reverse the district court. I respectfully dissent.