[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10482

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

WILLIAM DCORY MAURICE EASTERLY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:18-cr-00243-MHT-SRW-5

_____

Before GRANT, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

William Easterly pleaded guilty after he was caught with a firearm while transporting nearly a kilogram of cocaine. On appeal he argues that the officer who arrested him violated his Fourth Amendment right to be free from unreasonable seizure when the officer prolonged the traffic stop without reasonable suspicion of other criminal activity. Easterly also argues that his indictment should be dismissed because the magistrate below implicitly denied his pro se motion to discharge his retained counsel. After careful review, we affirm.

## I.

The Drug Enforcement Administration began to investigate Easterly when a confidential informant reported that he was dealing cocaine by the kilogram. To learn more, the DEA recorded calls between Easterly and another individual, Jose Ocampo-Gonzalez. The DEA had been monitoring Ocampo since it had learned that he was trafficking drugs at a large scale; the DEA had already arrested individuals who had been regularly purchasing large quantities of cocaine from him. The DEA determined from Easterly's calls that he was also purchasing cocaine from Ocampo.

On one call Easterly used coded language to arrange a cocaine purchase. Instead of offering money for cocaine, Easterly offered "TVs." And instead of asking how many kilograms of

cocaine Easterly wished to buy, Ocampo asked him how many "hands" he wanted.   But Ocampo failed to deceive law enforcement—they had cracked the code by interviewing Ocampo's prior purchasers and by analyzing other coded calls. Easterly called Ocampo again a few days later to change his order from five kilograms to one and to say that he would come the next Sunday.

The DEA prepared to intercept Easterly post-purchase. Ocampo was operating from his residence in Tuskegee, Alabama. The DEA predicted that Easterly would make the roundtrip from his home in Montgomery via the quickest route, Interstate 85.  It enlisted the help of the Alabama Law Enforcement Agency to make a directed traffic stop.  The DEA informed a state trooper that it expected Easterly would be transporting a significant amount of cocaine.

Before he left, Easterly called Ocampo to confirm his order and to mention that he would have his son with him.  That same morning, a DEA agent observed a black Ford Expedition with a small LED light bar on the front grille parked at Easterly's residence in Montgomery.  A few hours later, DEA agents monitoring Ocampo's residence observed Easterly and one passenger arrive in the black Expedition and then leave around an hour later.  When Easterly left Ocampo's property, he began driving back toward Montgomery on I-85, just as the DEA had predicted.

A state trooper, James Hendrix, was positioned at an exit ramp further along I-85 as he waited for instructions.  One of the

DEA agents radioed Hendrix as Easterly passed that exit. Spotting the Expedition, Hendrix pulled onto the highway and began to follow it. He determined that Easterly was speeding and that the vehicle's window tint was likely illegal as well. Hendrix activated his lights and initiated the traffic stop.

As soon as he approached the Expedition, Hendrix noticed "a chemical smell coming from the vehicle." Because of his extensive narcotics-enforcement experience, he associated the smell with hydrochloride—a cutting agent commonly used with cocaine. Hendrix verified Easterly's license and then issued warnings for the speeding and tint violations.

After issuing the warnings, Hendrix asked Easterly where he and his son were traveling, whether he was transporting anything illegal, and whether he could search the vehicle. Easterly initially consented to the search, but then began to act nervous. When Hendrix asked him to exit the vehicle, he stalled by asking questions. To Hendrix, this sudden nervousness indicated that Easterly had something illegal hidden in the vehicle.

Because Easterly was stalling, Hendrix told him that he was going to bring his K-9 around the vehicle instead, but that he still needed Easterly to exit the vehicle. At this point Easterly let the officers know that he had a gun in his waistband, so Hendrix called over another trooper to retrieve the gun. After the weapon was secured, Easterly and his son exited the vehicle. The dog alerted to the scent of narcotics by the driver door. When Hendrix searched the vehicle, he found a compressed white brick of cocaine in a

yellow plastic bag in the front center console.  It weighed just under one kilogram.

Easterly was charged with conspiracy to distribute and possess with intent to distribute controlled substances, possession with intent to distribute controlled substances, and possession of a firearm during and in relation to a drug-trafficking crime.  *See* 21 U.S.C. §§ 846, 841(a)(1), 18 U.S.C. § 924(c)(1)(A)(i).  Easterly moved to suppress all the evidence obtained directly or indirectly from the traffic stop.  He argued that Hendrix violated the Fourth Amendment when he kept investigating for narcotics after he had issued Easterly the warning tickets.  The magistrate concluded, "based on the totality of the circumstances and the collective knowledge of the law enforcement officers," that the stop and search were lawful.  The district court adopted the magistrate's recommendation in full.

A few weeks before his trial was scheduled, Easterly filed a pro se motion to discharge his retained counsel.  His counsel then moved to withdraw, noting that Easterly had instructed him to do so.

At the hearing on the motions, Easterly indicated that he would need appointed counsel if his motion was granted.  The magistrate was "not inclined to grant the motion" given the "specific standards" she thought governed the discharge of retained counsel in favor of appointed counsel.  The magistrate also noted that Easterly had to fill out a financial eligibility affidavit because he wanted to replace his retained counsel with appointed counsel.

In the follow-up order, the magistrate clarified that the standards for discharge of appointed counsel she had been considering did not extend to retained counsel. The magistrate thus instructed Easterly to submit the affidavit.

Instead of filing the affidavit, Easterly (through his counsel) moved to withdraw both his pro se motion to discharge and his counsel's motion to withdraw; the magistrate granted both requests. Easterly then pleaded guilty to possession with intent to distribute controlled substances and possession of a firearm during and in relation to a drug-trafficking crime.

After the guilty plea, Easterly's relationship with his attorney continued to deteriorate. This time, his counsel moved to withdraw before Easterly filed a second pro se motion to discharge the attorney. In response, the magistrate appointed new counsel and permitted Easterly to withdraw his guilty plea. Easterly then moved to dismiss his indictment with prejudice, arguing that the magistrate's "implicit denial of Easterly's *pro se* motion to discharge retained counsel" violated his Sixth Amendment right to counsel. The magistrate disagreed, pointing out that Easterly had withdrawn that pro se motion. The district court adopted the magistrate's recommendation and denied the motion.

Easterly again pleaded guilty, reserving the right—which he now exercises—to appeal the denials of the motion to suppress and the motion to dismiss the indictment.

## II.

When a district court denies a motion to suppress, we review its findings of fact for clear error and its application of the law to the facts de novo. *United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007). We construe all facts in the light most favorable to the prevailing party—the government. *Id.* at 1235. "We review the denial of a motion to withdraw as counsel for abuse of discretion." *United States v. Jimenez-Antunez*, 820 F.3d 1267, 1270 (11th Cir. 2016).

## III.

Easterly argues that Hendrix violated his Fourth Amendment right to be free from unreasonable seizure when Hendrix prolonged the traffic stop to investigate for drugs. He also claims that the magistrate violated his Sixth Amendment right to counsel by her "implicit denial" of his request to replace his retained counsel with appointed counsel. Both arguments fail.

## A.

We first consider Easterly's claim that the traffic stop evidence should have been suppressed because Hendrix unconstitutionally prolonged his traffic stop. Easterly does not dispute that Hendrix had authority to stop the vehicle initially for the speeding and tint violations. *See United States v. Hernandez*, 418 F.3d 1206, 1209 (11th Cir. 2005). And by the end of the stop, the positive alert of the drug detection dog provided obvious probable cause to search the vehicle. *See United States v. Braddy*,

11 F.4th 1298, 1312 (11th Cir. 2021). So the only question is whether Hendrix had reasonable suspicion to justify the questions and dog sniff after he issued the traffic warnings.

An officer may legally prolong a traffic stop to investigate for other criminal activity when he has a "reasonable suspicion" that the individual is engaging in that criminal activity. See Hernandez, 418 F.3d at 1209–10; see also Rodriguez v. United States, 575 U.S. 348, 355 (2015). A suspicion is reasonable when the officer can provide "a minimal level of objective justification," even if the facts and circumstances are insufficient to convince a reasonably prudent person to believe that a crime is being committed. Braddy, 11 F.4th at 1310; cf. United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985). We assess whether a suspicion is reasonable based on the totality of circumstances and give "due weight to the officer's experience." Braddy, 11 F.4th at 1310–11.

Officer Hendrix had several objective reasons to suspect Easterly of criminal activity. For one, the DEA had alerted Hendrix to its ongoing investigation into Easterly's activities. The day before, a DEA agent had contacted him to request his assistance in stopping Easterly's vehicle because they expected him "to be transporting narcotics." Although the record does not show that the DEA shared the particular facts or circumstances of its ongoing investigation with Hendrix, he knew that the DEA was monitoring Easterly's movement and had specific information about a narcotics transport the next day. The day of the stop, Hendrix knew that the DEA was actively tracking Easterly because an agent

21-10482              Opinion of the Court              9

radioed him when Easterly passed his exit and instructed him to stop and search the vehicle if possible. As for Hendrix's direct knowledge, as he approached Easterly's vehicle he immediately identified a strong smell he associated with a chemical used to cut cocaine. These objective facts generated a reasonable suspicion that Easterly was transporting cocaine. Hendrix thus had authority to prolong the stop, and the dog's alert provided probable cause to search the vehicle. *See Braddy*, 11 F.4th at 1312. Hendrix therefore did not violate Easterly's Fourth Amendment right to be free from unreasonable seizure.[1]

## B.

Easterly also claims that the magistrate denied him his choice of counsel by failing to immediately grant his pro se motion to discharge his retained counsel. Although a criminal defendant must show good cause to replace appointed counsel, he has the authority to dismiss retained counsel without good cause. *Jimenez*, 820 F.3d at 1271. But before a court can grant a motion to dismiss retained counsel, it must determine that the defendant "either will be represented by counsel or has made a knowing and

---

[1] We conclude that the search and seizure were lawful for a different reason than the court below, which found that probable cause existed based on "the collective knowledge of the law enforcement officers." Because the record does not demonstrate that the DEA shared all of the details of its investigation with Hendrix, we do not rely on that rationale. Even so, we may affirm a denial of a motion to suppress on "any ground supported by the record." *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012).

voluntary waiver of the right to counsel." *Id.* at 1272.  If the defendant desires appointed counsel, the court should determine whether the defendant is eligible. *Id.*

Easterly argues that the magistrate implicitly denied his motion by mentioning at a hearing that she was unlikely to grant it.  But after that hearing, the magistrate did not deny his motion—she ordered him to provide an affidavit that proved he was eligible for appointed counsel.  Easterly had communicated that he could not afford to retain another attorney, so the magistrate was right to assess whether he qualified for appointed counsel before ruling on his motion.  *See Jimenez*, 820 F.3d at 1272.  In the end, the magistrate was unable to grant the motion because Easterly withdrew it instead of submitting the affidavit.

★    ★    ★

Hendrix had a reasonable suspicion that Easterly was engaged in criminal activity, so he did not unreasonably prolong the traffic stop.  And the magistrate did not prevent Easterly from discharging his retained counsel—she granted his motion to withdraw the request to discharge retained counsel.  We thus **AFFIRM** the conviction.